**UNITED STATES, Appellee,**

v.

**Private First Class Gregory W. FOX, SSN 473–76–8877, United States Army, Appellant.**

**SPCM 13806.**

U. S. Army Court of Military Review.

12 Sept. 1979.

Colonel Edward S. Adamkewicz, Jr., JAGC, Major Benjamin A. Sims, JAGC, Captain Grifton E. Carden, JAGC, and Captain Peter A. Nolan, JAGC, were on the pleadings for appellant.

Major David McNeill, JAGC, Captain Robert D. Newberry, JAGC, and Captain Paul K. Cascio, JAGC, were on the pleadings for appellee.

Before JONES, CLAUSE and LEWIS, Appellate Military Judges.

## OPINION OF THE COURT

LEWIS, Judge:

Contrary to his pleas, appellant was convicted by a military judge, sitting as a special court-martial, of going from his place of duty without authority, willful disobedience of an order of his superior commissioned officer, dereliction of duty, malingering, wrongful appropriation of a government pistol and breach of restriction in violation of Articles 86, 90, 92, 115, 121 and 134, 10 U.S.C. §§ 886, 890, 892, 915, 921 and 934, respectively. His sentence of a bad-conduct discharge, confinement at hard labor for three months, forfeiture of $150.00 pay per month for three months and reduction to the grade of Private E–1 was approved by the convening authority.

Appellant assigns four errors as requiring corrective action. We will discuss the first one asserting that the military judge prejudicially erred by denying appellant's motion to suppress an admission to a criminal investigator.

A brief description of the events leading up to appellant's admission is necessary. On 8 November 1978, a caliber .45 pistol was reported missing from the top of a desk in a medical aid station where it had been laid by the person to whom it was assigned. Criminal Investigator T., responding to the request of the battalion where the loss occurred, conducted a crime scene survey and immediately located the weapon behind a bookcase adjacent to the desk. Following a conversation with appellant's battery commander, Agent T focused his suspicion upon appellant who, with several other American and Korean military personnel, was in the medical aid station where the weapon was taken. Agent T filled out some preliminary paper work, took appellant's fingerprints and advised him of his rights from Department of Army Form 3881, stating that he was suspected of larceny of the pistol. The appellant declined to answer questions and indicated that he wanted to see a lawyer. The interview was instantly terminated.

Two days later, while returning from another camp, Agent T stopped at appellant's

camp. He again talked to appellant's battery commander and learned that the appellant was "pending charges."[1] Finding the appellant playing "foosball" in the battalion recreation room, Agent T inquired whether he had seen a lawyer yet. Appellant replied to the effect that his lawyer's office was at still another camp and that appellant's commander did not let him have a vehicle to go see him. Appellant at that time reasserted his desire to see counsel, possibly even naming a specific one with whom he had an attorney-client relationship on his existing charges.[2] Agent T responded by saying, "Well, fine, I can't question [you] then." There followed a two hour conversation characterized by both Agent T and the appellant as "friendly" and "social." It covered, among other topics, the foosball machine, hometowns, airplane flying, personal background and the education plans of each. The appellant testified that he was initially reluctant to speak to Agent T, but following Agent T's remark that they could not talk about "the incident" and with the encouragement of appellant's friend,[3] he willingly engaged in palaver with the agent.[4] He felt no restraint and knew he could terminate the conversation and leave at any time. In fact, he finally did so by remarking that he was going "to chow." They left the recreation center at the same time, the appellant going "to chow" and the agent going toward his vehicle. Because "he was just friendly, and [appellant] liked to talk to him," appellant walked over to the vehicle to say goodbye. Thereupon appellant asked Agent T what would happen in the case. Agent T responded by saying he did not know because he did not make the decisions on court-martials. "The only thing I did was to gather the facts and information based on peoples [sic] conversations and statements and so forth. And that I had the fingerprints and had the weapon . . . [and] that I would have to send the weapon and the fingerprints off to a lab in Japan." There followed the admission of appellant that he was startled by being fingerprinted inasmuch as he had wiped his fingerprints from the weapon before he finally threw it behind the bookcase. Agent T then told him, "[R]emember, I have not asked you any questions pertaining to the case. I cannot do that." It is uncontroverted that, in fact, Agent T never did ask any such questions of appellant.

Clearly the above scenario did not involve an in-custody interrogation so as to activate the rule of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).[5] Likewise, it does not involve the rule of *United States v. McOmber*, 1 M.J. 380 (C.M.A.1976), or that of *United States v. Lowry*, 2 M.J. 55 (C.M.A.1976), because the appellant's attorney detailed to represent him in defending against then-pending charges had no relationship with the appellant in

1. In his testimony, Agent T steadfastly denied being told that any charges had been referred for trial. He also repeatedly denied being aware before he saw appellant later in the afternoon that the appellant was already represented by counsel in connection with those charges.

2. The charges were for many of the same Article 86 and 115 offenses of which he was convicted in the instant case. Having occurred before the pistol and disobedience incidents, they had been first referred on 19 October for trial by regular special court-martial. There is no evidence that Agent T knew any more at that point than that some charges were pending disposition somewhere and that the appellant had a lawyer in connection with them.

3. "Spec. 4 Cain was next to me [at the foosball table] and he said, 'don't be an ass hole, speak to him and see what he has to say.'" Appellant also testified that Specialist Cain said, "Now you don't need to be prickish [sic] about it, just go ahead and speak to him it might be important, it would be beneficial to you."

4. Asked what effect his friend's advice had upon him, appellant testified, "Nothing really, because, he's just a friend. I have got a mind of my own and I can think for myself, sir." He further testified that, while Agent T had said that they could not talk about the incident until he had talked to his lawyer, he had the feeling that Agent T wanted to get something out of him.

5. *See also United States v. Hill*, 5 M.J. 114 (C.M.A.1978).

connection with the totally unrelated pistol incident. Finally, it does not involve any impairment of freedom of will of the nature condemned in *United States v. Borodzik*, 21 U.S.C.M.A. 95, 44 C.M.R. 149 (C.M.A.1971), or a violation of the warning requirements of Article 31, UCMJ, 10 U.S.C. § 831, inasmuch as appellant's admissions were not elicited by the investigator.

What the scenario does involve, however, is more difficult to label and appraise. It was not improper for the agent to contact appellant to ascertain whether he had seen counsel when the agent did not know otherwise.[6] Accordingly, had he done so and then immediately left the recreation center with the appellant approaching the agent with his question and subsequent admission, the situation would fit comfortably within established precedent allowing the admission of the statement into evidence. Distinguishing this case, of course, is the two hours "social" chat during which no rights warnings pursuant to Article 31, UCMJ, and *Tempia, supra*, were given. Carefully examining that "chat", we find that foosball was not the only game appellant was playing in the recreation center. He was also voluntarily engaged in a cat-and-mouse game with the investigator.[7] He acquitted himself well during the game through its conclusion.[8] If interrogation were the aim of the cat, it was successfully thwarted by the mouse. It was not until afterward that the incriminating statement was made. We are satisfied that, at the time it was made, the statement was totally the product of appellant's free will and not in any way then elicited by Agent T. Because their mutual game had ended, we need not decide whether it constituted a subtle form of interrogation, improper both for lack of rights warnings and for any erosion of appellant's right to counsel. We would be remiss, however, if we failed to strongly caution against such police practices. In this case, it was only the appellant's sure-footedness in avoiding any admission *during* their game that kept the constable from blundering. Furthermore, appellant's intelligence and demonstrated sagacity convince us that the subsequent admission was not the product of the earlier, probably improper, conversation. Accordingly, this assignment of error lacks merit.

We have also considered the other assignments of error and find that they likewise lack merit.

The findings and sentence are affirmed.

Judge CLAUSE concurs.

JONES, Senior Judge, dissenting.

I dissent.

I agree with the majority that this case does not involve custodial interrogation that would activate the rule in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *United States v. Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967), but I disagree with their statement that neither a violation of the warning requirement of Article 31, Uniform Code of Military Justice, nor the Article 27, UCMJ, right to counsel rule announced in *United States v. McOmber*, 1 M.J. 380 (C.M.A.1976), are involved. I am unable to break the conversation between appellant and the investigator into such precise segments that I can say that any statement made by appellant after the agent started for his car was "totally the product of appellant's free will and not in any way then elicited by Agent T", while a statement made prior thereto may have

---

6. *United States v. Harris*, 7 M.J. 154 (C.M.A. 1979).

7. As for Agent T's testimony that his purpose for the protracted conversation became purely social after appellant said that he still had not seen his counsel, we remain incredulous. The life of a policeman cannot be so lonely as to convince us that he could not find better company than a person whom he is investigating for larceny of a pistol and who he knows is already under charges for unrelated offenses.

8. The appellant is intelligent, a secondary school graduate enrolled in college courses and a medical aid man who ranked high in his medical classes. Moreover, he apparently was thoroughly on guard during the period in question. *See* note 4, *supra*.

resulted from a subtle form of interrogation and from a violation of appellant's right to counsel. I believe the lengthy conversation between appellant and the investigator was one continuous attempt by the investigator to obtain an admission from appellant without first advising him of his rights and without affording his counsel the right to be present.

## I

Article 31(b), UCMJ provides:

No person subject to this chapter may interrogate, or request any statement from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

It is undisputed that when the investigator spoke to appellant on the 10th of November he did not first advise him of his rights. Also undisputed is appellant's status as a suspect. What is disputed is whether the investigator interrogated appellant or requested a statement from him.

I join by brothers in expressing incredulity at the investigator's explanation of the 2½ hour conversation as a "chat" or a social encounter. Obviously it was more than that. The majority would classify it as a permissible technique of investigation where the agent was doing nothing more than gaining the confidence of the suspect by showing himself to be a pleasant, trusting human being who for more than two hours kept his word not to discuss the investigation. I think the conversation was a calculated effort not only to gain the appellant's confidence but to induce the appellant to volunteer a statement or to blunder into a damaging admission. Why else would the investigator first speak to the company commander, then go to the accused and, while proclaiming the prohibition against questioning, prolong the encounter with the suspect for two and one-half hours?

I find Judge Darden's language from *United States v. Borodzik*, 21 U.S.C.M.A. 95, 44 C.M.R. 149 (1971), appropriate here:

When conversation is designed to elicit a response from a suspect, it is interrogation, regardless of the subtlety of the approach. (44 C.M.R. at 151).

The discussion Agent Tucker had with the appellant in my opinion was designed to elicit a response or responses concerning appellant's involvement in the larceny offense. As no warning was given, the admission was inadmissible. Article 31(d), UCMJ.

## II

Rejection of the statement was also required by the rule regarding the right to counsel enunciated in *United States v. McOmber, supra*. In that case the Court of Military Appeals held that:

Once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31(d) of the Uniform Code. 1 M.J. at 383.

*McOmber* involved an investigator's questioning of an accused on the same offenses about which the investigator had questioned him previously although he knew the accused was represented by counsel in the investigation of those offenses.

In *United States v. Lowry*, 2 M.J. 55 (C.M.A.1976), the Court of Military Appeals extended the rule of *McOmber* to proscribe subsequent questioning by an investigator about a related offense when he knew the accused was represented by counsel for the offense for which he was questioned initially. That Court has refused to extend the *McOmber* rule, however, to a situation where the subsequent questioning concerned an unrelated offense and was by an investigator who did not know the accused was represented by counsel. *United States*

*v. Harris*, 7 M.J. 154 (C.M.A.1979).\* Similarly, this Court has declined to extend the rule to questioning by an investigator who should have known but in fact did not know that the accused had counsel. *United States v. Roy*, 4 M.J. 840 (A.C.M.R.1978). *Roy* left unanswered the case where the investigator may have acted in bad faith or may have attempted to circumvent *McOmber* and *Lowry*. This case falls within the caveat posed by *Roy*.

At the time of Agent Tucker's extended conversation with the appellant, the appellant was pending trial by special court-martial for malingering and AWOL, and charges had been preferred for willful disobedience, dereliction of duty and the very larceny offense that was the subject of the investigation.

Agent Tucker knew appellant was represented by counsel for some offenses, knew the counsel's name and address, and knew that appellant had not been furnished transportation by his unit to consult with him. The Government cannot now be heard to say that the counsel did not also represent appellant for the larceny offense at that time. Where an accused is represented by counsel for certain pending charges, and where other charges are preferred with a view to consolidation for trial, and where an accused asks but is precluded from seeing his counsel on the new charges, then at least for the purpose of the *McOmber/Lowry* rule, the accused is represented by counsel for all of the offenses. *Cf. United States v. Turner*, 5 M.J. 148 (C.M.A. 1978). I would hold the statement inadmissible because Agent Tucker failed to afford appellant's counsel a reasonable opportunity to be present during the extended social chat.

Finding the statement inadmissible, I would set aside the conviction of Additional Charge III.

---

\* This case differs from *United States v. Harris*, 7 M.J. 154 (C.M.A.1979), in two important respects. First, Harris was given a complete Article 31/*Tempia* warning. Here the appellant was given no warning. Second, the investigator in *Harris* inquired and was told that Harris did not have counsel. Here the investigator inquired if appellant had seen a counsel, was told he had been unable to see him, and was advised of the counsel's name and address.